**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| MICHIGAN ASSOCIATION OF PUBLIC SCHOOL ACADEMIES, <br><br> & <br><br> THOMAS B. FORDHAM INSTITUTE, <br><br>     Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF EDUCATION, <br><br> & <br><br> MIGUEL CARDONA, U.S. SECRETARY OF EDUCATION <br><br> & <br><br> RUTH E. RYDER, DEPUTY ASSISTANT SECRETARY FOR POLICY AND PROGRAMS, OFFICE OF ELEMENTARY AND SECONDARY EDUCATION, <br><br>     Defendants. | CIVIL ACTION NO.: 1:22-cv-00712 <br><br> **COMPLAINT** <br><br> *JURY TRIAL DEMANDED* |

## INTRODUCTION

Public charter schools provide an educational lifeline to parents and students across the country. In many school districts, particularly those serving low-income and disadvantaged kids, traditional public schools have failed to deliver on the promise of a quality education. Public charter schools, which have the flexibility to offer innovative educational programs, can help provide opportunities that otherwise would not be available. These public charter schools can be truly life-changing for the students who attend them.

1

Because of the great untapped potential for public charter school programs, Congress set aside hundreds of millions of dollars per year to fund innovative, high-quality charter school programs nationwide. Congress had a clear goal—"increase the number of high-quality charter schools available to students across the United States." 20 U.S.C. § 7221(3).

Unfortunately, the U.S. Department of Education is channeling the Administration's apparent hostility towards charter schools into unconstitutional rulemaking, which will rob the neediest students of educational opportunity. In a new administrative rule, *Final Priorities, Requirements, Definitions, and Selection Criteria—Expanding Opportunity Through Quality Charter Schools Program (CSP)—Grants to State Entities (State Entity Grants); Grants to Charter Management Organizations for the Replication and Expansion of High-Quality Charter Schools (CMO Grants); and Grants to Charter School Developers for the Opening of New Charter Schools and for the Replication and Expansion of High-Quality Charter Schools (Developer Grants)*, 87 Fed. Reg. 40,406 (July 6, 2022), the Department has set out new criteria for grant awards that are designed to *decrease* charter school programs, and ensure that failing public schools don't have to compete with innovative alternatives.

The Department's attack on the charter school program it is tasked with administering is unlawful. Not only does the Department lack the authority to issue any new criteria; the proposed factors will punish the most successful charter school programs, particularly in school districts that enroll large numbers of minority students. All the while, the rule comes from an agency employee, and lacks even the blessing of a properly-appointed officer of the United States. The Department's sneak attack on the charter school program, and on the students caught in the middle, must be set aside by this Court.

## PARTIES

1.     Plaintiff Michigan Association of Public School Academies (MAPSA), is a nonprofit member association headquartered in Lansing, Michigan, that represents public charter schools throughout the state of Michigan.

2.     MAPSA's membership includes approximately 250 public charter schools and 8 charter school authorizers across the state of Michigan.

3.     MAPSA provides advocacy and institutional support for its membership, and for more than 25 years has worked to advance the interests of public charter school stakeholders.

4.     MAPSA facilitates public support for the charter school movement by utilizing its effective legislative avenues to build positive government relations, amplifying stories of success from member schools, educators, and students statewide, and working closely with charter stakeholders to understand their needs and challenges, so that it can effectively give the charter community a voice on the issues that matter.

5.     Plaintiff Thomas B. Fordham Institute (Fordham), is a nonprofit organization with offices in Washington, DC, and Ohio.

6.     Fordham promotes educational excellence for every child in America via quality research, analysis, and commentary, as well as advocacy and exemplary charter school authorizing in Ohio.

7.     Among its activities on behalf of public charter schools, Fordham advocates for ambitious standards in all academic subjects, strong assessments of student learning, aligned and well-implemented curricula, and common-sense accountability for schools and children across the achievement spectrum.

8.     Fordham also produces relevant, rigorous research, analysis, and commentary for education practitioners and for policymakers at the national, state, and local levels; incubates new

ideas, innovations, organizations, and visionary leaders to advance educational excellence; advances sound policies in Ohio related to standards, assessments, results-driven accountability, equitable funding, school choice, and other important education reforms; and serves as a model charter school authorizer, which shares its lessons throughout and beyond Ohio.

9.    Defendant U.S. Department of Education (ED) is an agency of the United States, which is sued in its official capacity.

10.    Defendant ED issued the rule subject to the challenge in this case, *Final Priorities, Requirements, Definitions, and Selection Criteria—Expanding Opportunity Through Quality Charter Schools Program (CSP)—Grants to State Entities (State Entity Grants); Grants to Charter Management Organizations for the Replication and Expansion of High-Quality Charter Schools (CMO Grants); and Grants to Charter School Developers for the Opening of New Charter Schools and for the Replication and Expansion of High-Quality Charter Schools (Developer Grants)*, 87 Fed. Reg. 40,406 (July 6, 2022).

11.    Defendant Miguel Cardona is the U.S. Secretary of Education and is sued in his official capacity.

12.    Secretary Cardona is the agency head of Defendant ED, which is responsible for issuing the challenged rule.

13.    Defendant Ruthe E. Ryder is the Deputy Assistant Secretary for Policy and Programs, Office of Elementary and Secondary Education for Defendant ED, and is sued in her official capacity.

14.    Deputy Assistant Secretary Ryder issued the challenged rule on behalf of Defendant ED.

15.    Throughout this Complaint, Defendants are referred to jointly as ED or the Department except where otherwise specified.

4

## JURISDICTION AND VENUE

16.     This Court has federal question jurisdiction pursuant to 5 U.S.C. § 702 and 28 U.S.C. § 1331.

17.     This Court has the authority to grant an injunction and declaratory judgment in this matter pursuant to 28 U.S.C. §§ 2201, 2202 and 5 U.S.C. §§ 705, 706(2).

18.     Venue for this action properly lies in this district pursuant to 5 U.S.C. § 703 and 28 U.S.C. § 1391(b)(2), (e)(1), because a defendant resides in this district, certain plaintiffs reside in this judicial district, and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## STATEMENT OF FACTS

### I. LEGAL BACKGROUND

#### A. Statutory Background

19.     The federal Charter Schools Program helps pay costs to start and expand public charter schools.

20.     The program, proposed and established in 1994 by President Bill Clinton, represents the federal government's commitment to help charter schools meet planning, start-up, and early implementation costs. By helping charter schools overcome financial barriers, the CSP is also designed to increase the number of charter schools nationwide.

21.     In 2015, Congress passed a significant expansion to that program—the Expanding Opportunity Through Quality Charter Schools Act, codified at 20 U.S.C. § 7221 *et seq*.

22.     The Act allocated funding for the creation and expansion of charter schools nationwide, and its "purpose" was direct—to "provide financial assistance for the planning, program design,

and initial implementation of charter schools" in order to "increase the number of high-quality charter schools available to students across the United States." 20 U.S.C. §§ 7221(2), (3).

23. To accomplish its purpose, the Act obligates the Secretary of Education to distribute hundreds of millions in dollars in grants annually. *See* 20 U.S.C. §§ 7221a(b), 7221b, 7221d.

24. Most of these funds are directed toward "supporting the startup of new charter schools, the replication of high-quality charter schools, and the expansion of high-quality charter schools." 20 U.S.C. § 7221a(a)(1).

25. Some of the grants are earmarked for state entities that award subgrants to help eligible parties open or expand high-quality charter schools or expand high-quality charter schools. 20 U.S.C. §§ 7221b(b)(1)(A)-(C).

26. Other funds are set aside for direct grants to "charter management organization[s]" for the "replication and expansion of high-quality charter schools." 20 U.S.C. § 7221d(b).

27. A "high-quality charter school" is one that has "demonstrated success" in raising academic achievement, including for economically disadvantaged students, students from major racial and ethnic groups, children with disabilities, and English learners. 20 U.S.C. § 7221i(8).

28. Congress also set forth clear criteria guiding awards under the Act.

29. For grants to state entities, the Secretary of Education is directed to award grants "on the basis of the quality of the applications submitted" "after taking into consideration" five criteria: (1) "the degree of flexibility afforded by the State's charter school law and how the State entity will work to maximize the flexibility provided to charter schools under such law;" (2) "the ambitiousness of the State entity's objectives for the quality charter school program carried out under this section;" (3) "the likelihood that the eligible applicants receiving subgrants under the program will meet those objectives and improve educational results for students;" (4) "the State

entity's plan to" "monitor" subgrant applicants and "provide technical assistance and support" to them; and (5) "the State entity's plan to solicit and consider input from parents and other members of the community on the implementation and operation of charter schools in the State." 20 U.S.C. § 7221b(g)(1).

30.     The Secretary is also directed to "give priority" to a State entity to the extent that (1) the State has allowed at least one "public chartering agency" that is "not a local educational agency" or has "an appeals process for the denial of an application for a charter school;" (2) the State "ensures equitable financing, as compared to traditional public schools, for charter schools and students in a prompt manner;" (3) the State provides charter schools with funding, or assistance concerning access to facilities; (4) the State "uses best practices from charter schools to help improve struggling schools and local educational agencies," (5) the "State entity supports charter schools that serve at-risk students through activities such as dropout prevention, dropout recovery, or comprehensive career counseling services;" and (6) the "State entity has taken steps to ensure that all authorizing public chartering agencies implement best practices for charter school authorizing." *Id*. § 7221b(g)(2).

31.     Notably, the statute does not include any delegation of authority for the Secretary to consider or implement new criteria or priorities. *See id.*

32.     For direct awards, the Secretary of Education is likewise required to consider three criteria. 20 U.S.C. § 7221d(b)(4).

33.     The Secretary "shall select eligible entities to receive grants" based on: (1) "the degree to which the eligible entity has demonstrated success in increasing academic achievement for all students and for [economically disadvantaged students, students from major racial and ethnic groups, children with disabilities; and English learners] attending the charter schools the eligible

entity operates or manages;" (2) "the eligible entity has not operated or managed a significant proportion of charter schools that have been closed" or "had the school's charter revoked due to problems with statutory or regulatory compliance; or have had the school's affiliation with the eligible entity revoked or terminated, including through voluntary disaffiliation;" and (3) "the eligible entity has not experienced significant problems with statutory or regulatory compliance that could lead to the revocation of a school's charter."

34.    The Secretary is also ordered to "give priority to eligible entities that" meet one or more of four factors: (1) "plan to operate or manage high-quality charter schools with racially and socioeconomically diverse student bodies," (2) "demonstrate success in working with schools identified by the State for comprehensive support and improvement" as being low performing; (3) "propose to use funds to "expand" or "replication" high-quality charter schools to serve high school students; or (4) "propose to operate or manage high-quality charter schools that focus on dropout recovery and academic reentry." 20 U.S.C. § 7221d(b)(5).

35.    As with awards to State entities, the Secretary is not delegated authority to consider additional criteria or impose additional priorities. *See id.*

36.    Congress limited the regulatory discretion of the Secretary of Education in two targeted provisions.

37.    In 20 U.S.C. § 7221f, Congress provided that, to "the extent practicable, the Secretary shall ensure that administrators, teachers, and other individuals directly involved in the operation of charter schools are consulted in the development of any rules or regulations required to implement" "any . . . program administered by the Secretary that provides education funds to charter schools or regulates the activities of charter schools."

38.     In 20 U.S.C. § 7221h, Congress wrote, "To the extent practicable, the Secretary and each authorized public chartering agency shall ensure that implementation of this subpart results in a minimum of paperwork for any eligible applicant or charter school."

39.     According to the Senate's committee report, these provisions were part of a broader effort to require "the Department of Education to examine the impact, including costs, burdens, and benefits of regulations before issuing them, as well as to gather ample stakeholder input, including individuals such as Federal, State, and local administrators, parents, teachers, principals, school leaders, and charter school leaders." U.S. Senate, Committee on Health, Education, Labor and Pensions, *Report to Accompany Every Child Achieves Act of 2015*, S.1177, S.R. Rep. No. 114-231 at 33 (2015). "The intent is that the Secretary will thoughtfully gather feedback and consider impact before issuing new regulations." *Id*.

### B. The Biden Administration's Regulatory Proposal

40.     On March 10, 2022, Congress appropriated $440 million for the federal charter school program for 2023. *See* Public Law No. 117-103, Title III.

41.     During his campaign President Biden made his views of charter schools clear, saying he was "not a charter school fan." *See* Grabien, *Joe Biden on Why He Is 'Lukewarm' on Charter Schools: 'I Am Not a Charter School Fan,'* (Feb. 26, 2020) *available at* https://grabien.com/story.php?id=275743.

42.     No wonder then, a day after Congress appropriated funds to the charter school program, the Department of Education released a proposed rule dramatically undermining the grant program. *See Proposed Priorities, Requirements, Definitions, and Selection Criteria: Expanding Opportunity through Quality Charter Schools Program: Grants to State Entities; Grants to*

*Charter Management Organizations for the Replication and Expansion of High-Quality Charter Schools; etc.*, 87 Fed. Reg. 14,197 (Mar. 14, 2022).

43.     In response to the proposal, tens of thousands of commenters filed objections within the 35 days allotted by the Department.

44.     Among the objections, Pacific Legal Foundation filed an 18-page comment that raised several substantive issues. Notably the comment objected because the Department "has no authority to issue additional selection criteria," as the Act "includes no provision allowing the Secretary to designate additional criteria or priorities for awarding grants." The comment also argued that the "proposed rule was not issued by an officer of the United States, and thus any final rule that might result would proceed from an invalid action."

### C. The Final Rule

45.     On July 5, 2022, Deputy Assistant Secretary Ryder issued the final priorities on behalf of the Department. *Final Priorities, Requirements, Definitions, and Selection Criteria—Expanding Opportunity Through Quality Charter Schools Program (CSP)—Grants to State Entities (State Entity Grants); Grants to Charter Management Organizations for the Replication and Expansion of High-Quality Charter Schools (CMO Grants); and Grants to Charter School Developers for the Opening of New Charter Schools and for the Replication and Expansion of High-Quality Charter Schools (Developer Grants)*, 87 Fed. Reg. 40,406, 40,428 (July 6, 2022).

46.     Deputy Assistant Secretary Ryder is a career service employee of the Department, was neither appointed by the President nor Secretary of Education and is not Senate-confirmed.

47.     The rule set out "two priorities, three application requirements, and two selection criteria for CMO Grants and Developer Grants; six application requirements and one selection criterion

for State Entity Grants; and several assurances, definitions, and selection criteria applicable to CSP State Entity Grants, CMO Grants, and Developer Grants." 87 Fed. Reg. at 40,406.

48.    They were asserted to "supplement" the criteria set out in the Act for choosing grant awards. *Id*.

49.    "These priorities, requirements, definitions, and selection criteria are effective August 5, 2022." *Id*.

50.    The Department also described the comment process and provided responses to some of the comments it received. *Id*. at 40,407. However, it said that it did "not address general comments that raised concerns not directly related to any of the proposed priorities, requirements, definitions, or selection criteria in the" proposed rule. *Id*. It did not, therefore, address comments directed at the Department's lack of authority to issue the rule or its issuance by an inferior officer, such as the one filed by Pacific Legal Foundation. *See id.*

51.    The Department's only description of the legal authority to issue the rule was a citation to the Act. *See id.* ("*Program Authority*: Title IV, part C of the ESEA (20 U.S.C. 7221–7221j).").

52.    The rule addressed the abbreviated comment period, noting that in the 35-day period, "26,586 parties submitted comments," with "[a]pproximately 5,770 of the total comments received [being] unique comments." *Id.* at 40,407. In response to numerous objections that the comment period was too short for the agency "to engage in meaningful discussions with the charter school community about the proposed changes," the Department insisted that it carefully reviewed each of these comments." 40,410. It said, moreover, "Given the Biden-Harris Administration's commitment to ensuring that all students attending charter schools have access to a high-quality education, we decline to delay publishing the NFP or to withdraw the NPP." *Id*.

11

53. The rule established both "priorities" and "requirements" for applicants, both of which are to be used to grade applicants and guide decision-making for the Department. *Id.* at 40,410, 40,414, 40,426.

54. The priorities will be designated "as absolute, competitive preference, or invitational" in specific future grant applications applying the rule. *Id*. 40,420. "Under an absolute priority, [the Department will] consider only applications that meet the priority." *Id*. The Department also made clear that it retains "discretion to designate [any] priority as invitational, competitive preference, or absolute in any given competition[.]" *Id*. at 40,412. Indeed, the Department emphasized that "when establishing a priority for use in a program, [it] generally do[es] not identify the priority as absolute, competitive preference or invitational, to allow the Department flexibility to determine how the priority should be used in any future competition." *Id*. at 40,410.

55. The "requirements" meanwhile establish mandatory components of an application that constitute the "final selection criteria" of proposed projects. *Id*. at 40,426. "[P]eer reviewers" selected by the Department will evaluate "the quality of an applicant's response to all application requirements. The overall quality of an application, and whether it is recommended for funding, is evaluated by peer reviewers based on an applicant's responses to the specific selection criteria and any competitive preference priorities established for the competition." *Id.* at 40,414.

### 1. The Final Priorities

56. The rule establishes two priorities applied to all Charter Management Organization or Developer Applicants. *Id.* at 40,420.

57. Priority one states, "an applicant must propose to open a new charter school, or to replicate or expand a high quality charter school, that is developed and implemented" "[w]ith meaningful and ongoing engagement with current or former teachers and other educators; and" "[u]sing a

community-centered approach that includes an assessment of community assets, informs the development of the charter school, and includes the implementation of protocols and practices designed to ensure that the charter school will use and interact with community assets on an ongoing basis to create and maintain strong community ties." *Id*. The applicant "must provide a high-quality plan that demonstrates how its proposed project would meet the[se] requirements," "accompanied by a timeline for key milestones[.]" *Id*.

58.      Priority two says that "an applicant must propose a new collaboration, or the continuation of an existing collaboration, with at least one traditional public school or traditional school district" that "includes implementation of one or more of" nine types of collaboration or sharing of resources between the traditional school district and the applicant. *Id*. Additionally, "an applicant must provide a description of the collaboration that—(1) Describes each member of the collaboration and whether the collaboration would be a new or existing commitment; (2) States the purpose and duration of the collaboration; (3) Describes the anticipated roles and responsibilities of each member of the collaboration; (4) Describes how the collaboration will benefit one or more members of the collaboration, including how it will benefit students or families affiliated with a member and lead to increased educational opportunities for students, and meet specific and measurable, if applicable, goals; (5) Describes the resources members of the collaboration will contribute; and (6) Contains any other relevant information." *Id*. And an applicant must also "provide evidence of participation in the collaboration." *Id*.

59.      In responding to comments that had expressed concern that this priority would allow traditional schools to effectively hamper charter schools by withholding collaboration, the Department insisted that the priority should not "be implemented in a manner that creates barriers for eligible applicants seeking to obtain approval of a charter application or an application for CSP

13

funding to support the creation, replication, or expansion of a high-quality charter school." *Id.* at 40,412. However, it emphasized that it was intended to "encourage" collaboration, and while the Department said it did "not intend to use this priority as an absolute or competitive preference priority in FY 2022," it retained "flexibility" and "discretion" to so designate it in future periods. *Id.* at 40,410, 40,412, 40,420.

## 2. The Final Requirements

60.    The rule also established various requirements that apply to Charter Management Organization, Developer Applicants, and State Entity Grants. *Id.* at 40,421–22. As relevant here, Requirement 1 applies directly to Charter Management Organization and Developer Applicants, whereas for State Entity Grants the state applicant "must certify that it will require each subgrant applicant to provide a needs analysis" identical to the one required of direct applicants. *Id.* at 40,422.

61.    Under Requirement 1 each applicant (or sub-applicant to a state recipient) "must provide a needs analysis" for the project. *Id.* at 40,421, 40,423.

62.    The needs analysis "must include" consideration of six elements. *Id.* at 40,421.

63.    First, the needs analysis must include "[d]escriptions of the local community support, including information that demonstrates interest in, and need for, the charter school; benefits to the community; and other evidence of demand for the charter school that demonstrates a strong likelihood the charter school will achieve and maintain its enrollment projections." *Id*. "Such information may include information on waiting lists for the proposed charter school or existing charter schools or traditional public schools; data on access to seats in high quality public schools in the districts from which the charter school expects to draw students[.]"

64.     Second, and relatedly, the needs analysis must include "[i]nformation on the proposed charter school's projected student enrollment, and evidence to support the projected enrollment based on the needs analysis." *Id*. "District over-enrollment is one of several possible factors that an applicant may cite to evince the need for the proposed charter school." *Id.* at 40,414.

65.     Third and fourth, the charter school must produce a "robust family and community engagement plan designed to ensure the active participation of families and the community," and an explanation for how "the plans for the operation of the charter school will support and reflect the needs of students and families in the community, including consideration of district or community assets and how the school's location, or anticipated location if a facility has not been secured, will facilitate access for the targeted student population." *Id.* at 40,421.

66.     Fifth, the applicant must address the racial makeup of the school in two elements.

67.     It must provide an "analysis of the proposed charter school's projected student demographics and a description of the demographics of students attending public schools in the local community in which the proposed charter school would be located and the school districts from which students are, or would be, drawn to attend the charter school; a description of how the applicant plans to establish and maintain a racially and socioeconomically diverse student body, including proposed strategies (that are consistent with applicable legal requirements) to recruit, admit, enroll, and retain a diverse student body." *Id*.

68.     Furthermore, the applicant must provide a "description of the steps the applicant has taken or will take to ensure that the proposed charter school (1) would not hamper, delay, or negatively affect any desegregation efforts in the local community in which the charter school would be located or in the public school districts from which students are, or would be, drawn to attend the charter school, including efforts to comply with a court order, statutory obligation, or voluntary

efforts to create and maintain desegregated public schools; and (2) to ensure that the proposed charter school would not otherwise increase racial or socioeconomic segregation or isolation in the schools from which the students are, or would be, drawn to attend the charter school." *Id*.

69.     In addressing commenter concerns that these requirements would disadvantage applicants that reflected their community demographics and that serve predominantly minority student populations, the Department insisted that "an applicant that proposes to operate or manage a charter school in a racially or socio-economically segregated or isolated community would not be at a competitive disadvantage *simply* due to community demographics." *Id.* at 40,414 (emphasis added). While acknowledging that it considered a school that served a predominantly minority student body to be one that is racially segregated or isolated, the Department insisted that an applicant could attempt to mitigate any competitive disadvantage. *Id.*

70.     The requirement thus provides, "An applicant that is unlikely to establish and maintain a racially and socioeconomically diverse student body at the proposed charter school because the charter school would be located in a racially or socio-economically segregated or isolated community, or due to the charter school's specific educational mission, must describe—(i) why it is unlikely to establish and maintain a racially and socioeconomically diverse student body at the proposed charter school; (ii) how the anticipated racial and socio-economic makeup of the student body would promote the purposes of the CSP, including to provide high-quality educational opportunities to underserved students, which may include a specialized educational program or mission; and (iii) the anticipated impact of the proposed charter school on the racial and socio-economic diversity of the public schools and school districts from which students would be drawn to attend the charter school." *Id.* at 40,421.

71.    The Department cautioned, however, that schools that exceed their community's racial balance would continue to be disadvantaged. *Id.* at 40,414.

72.    The Department said that "a proposed charter school in a community in which 95 percent of the students are Latino, and that draws students from school districts with roughly 95 percent Latino students both before and after the creation of the proposed charter school, would *not* be at a competitive disadvantage due to this requirement[.]" *Id*. (emphasis added). But this was only "because the proposed charter school would not *increase* the racial or socioeconomic segregation or isolation in the schools from which the students are, or would be, drawn to attend the charter school." *Id*. (emphasis added).

### 3. The Final Selection Criteria

73.    Finally, the Department set out its "final selection criteria" for evaluating these requirements. *Id.* at 40,426.

74.    Applicants are graded on the "quality of the needs analysis." *Id.*

75.    "In determining the quality of the needs analysis, the Secretary considers one or more of the following factors: (1) The extent to which the needs analysis demonstrates that the proposed charter school will address the needs of all students served by the charter school, including underserved students; will ensure equitable access to high quality learning opportunities; and demonstrates sufficient demand for the charter school. (2) The extent to which the needs analysis demonstrates that the proposed charter school has considered and mitigated, whenever possible, potential barriers to application, enrollment, and retention of underserved students and their families. (3) The extent to which the proposed charter school is supported by families and the community[.]" *Id*.

## II. THE EFFECT ON PLAINTIFFS

76.     Since 2019, at least 20 of MAPSA's members were awarded grants under the federal CSP.

77.     These recipients of CSP grants relied on the federal awards to either open new schools or expand existing programs.

78.     Michigan's public charter schools serve higher numbers of economically disadvantaged and minority students than Michigan's traditional public schools.

79.     In 2020, Michigan's public charter school enrollment was comprised of approximately 76% economically disadvantaged students, 50% black students, and 10% Hispanic or Latino students.

80.     By contrast, in 2020, traditional public school enrollment was comprised of approximately 48% economically disadvantaged students, 14% black students, and 8% Hispanic or Latino students.

81.     MAPSA's members who have received CSP grants include charter schools in Genesee County and Wayne County.

82.     In Wayne County, nearly half of public school students attend public charter schools.

83.     Wayne County public schools, moreover, are not at capacity and have ample space for additional student enrollment.

84.     Public charter schools in Wayne County significantly outperform traditional public schools in that district in nearly every academic metric.

85.     For example, on the M-STEP test, charter schools in Detroit outperformed traditional schools in 15 of 18 subject areas.

86.     In the U.S. News and World Report's Best High Schools in America rankings, the top nine open-enrollment high schools in Detroit are all charter schools.

18

87.     When it comes to graduation rates, the top 10 high schools in Detroit are all charter schools.

88.     In looking at SAT scores, the top 12 high schools in Detroit are all charter schools.

89.     When it comes to graduates who actually enroll in college, the top nine high schools in Detroit are all charter schools.

90.     Wayne County's public charter schools also serve higher numbers of economically disadvantaged and minority students than traditional public schools.

91.     In 2020, Wayne County public charter school enrollment was comprised of approximately 84% economically disadvantaged students, 67% black students, and 9% Hispanic or Latino students.

92.     By contrast, in 2020, traditional public school enrollment in Wayne County was comprised of approximately 59% economically disadvantaged students, 34% black students, and 9% Hispanic or Latino students.

93.     In Genesee County, public charter schools serve large numbers of students, even though Genesee County public schools are not at capacity and have ample space for additional student enrollment.

94.     Public charter schools in Genesee County also significantly outperform traditional public schools in that district in nearly every academic metric.

95.     Genesee County's public charter schools also serve higher numbers of economically disadvantaged and minority students than traditional public schools.

96.     In 2020, Genesee County public charter school enrollment was comprised of approximately 91% economically disadvantaged students, 80% black students, and 3% Hispanic or Latino students.

97.     By contrast, in 2020 traditional public school enrollment in Genesee County was comprised of approximately 56% economically disadvantaged students, 19% black students, and 5% Hispanic or Latino students.

98.     Some of MAPSA's more than 250 members intend to apply for grants under the federal CSP in future competition periods.

99.     The new rule will disadvantage some or all of MAPSA's members in competition for CSP funding, particularly the successful programs in Genesee and Wayne Counties because those districts are not over-enrolled, charter programs serve large concentrations of minority students, and traditional public schools in those communities have not shown a willingness to cooperate with charter school programs.

100.    The new rule will particularly disadvantage MAPSA's members that operate in urban areas in Michigan, as they will be unlikely to meet the new rule's priorities related to community collaboration, as many local school districts have demonstrated hostility to charter school expansion and will be unlikely to assist new or existing charter schools.

101.    The new rule will also disadvantage MAPSA's members concerning the grading of the "quality of the needs analysis" requirement as the members will not be able to demonstrate a "sufficient demand" for the charter schools based on enrollment numbers in existing public schools. Many of the traditional school districts in Michigan have ample space for new students.

102.    Many of MAPSA's membership will be unable to demonstrate that their proposed programs will serve a "racially … diverse student body" as defined by the new rule, because they will be located in communities that are predominantly comprised of minority students, and thus the new rule defines the community as being "racially segregated or isolated."

103.     These MAPSA members will also be disadvantaged by the new rule because their student demographics will likely serve larger percentages of students who are racial minorities than the community at large, and thus will be viewed as increasing the racial segregation or isolation of the students in the proposed charter school projects.

104.     In 2015, the state of Ohio received a state entity grant under the CSP to significantly increase access to high-performing public charter education opportunities for Ohio's disadvantaged students.

105.     Ohio's initial allocation of funding was approximately $70 million for 2015–20.

106.     Ohio's grant was then renewed through fiscal year 2022.

107.     Ohio has applied for renewed funding for fiscal year 2023 and beyond.

108.     To help administer the grant, the State of Ohio convened an advisory committee made up of "key stakeholder groups in Ohio representing nonprofits with relevant expertise in community school sponsor quality; community school organizations; institutes of higher education with expertise in performance management; high-quality community school management organizations; organizations that represent the interests of families and children enrolled in community schools; and a national organization with expertise in community school oversight and quality."

109.     Fordham is a member of Ohio's CSP Grant Advisory Committee.

110.     Fordham has been a charter school sponsor (also known as "authorizer") in the state of Ohio since 2005.

111.     According to the State of Ohio, "A sponsor has the authority (ability) to establish a community [charter] school. Sponsors ensure that schools adhere to their contracts, and they make

important decisions, such as whether to renew contracts with community schools. They also provide oversight and technical assistance."

112.    The Ohio Department of Education annually evaluates a sampling of community school sponsors on three components: (1) The academic performance of the community schools they sponsor; (2) Their compliance with all applicable laws and rules; and (3) Their adherence to quality sponsoring practices.

113.    For the 2018–19 school year, which was the last year for which the Ohio Department of Education evaluated Fordham's sponsorship, the Department rated Fordham as "effective," having met or exceeded expectations in compliance and quality practices.

114.    For the 2021–22 school year, Fordham sponsored 12 charter schools serving approximately 5,500 students in four cities in Ohio.

115.    For the 2022–23 school year, Fordham is sponsoring 13 charter schools in four cities in Ohio.

116.    One or more of the schools Fordham has sponsored have received CSP funds through the state entity grants provided to Ohio.

117.    Specifically, of the 13 schools Fordham is currently sponsoring, 9 have received CSP grants directly or were merged with a school that received a CSP grant.

118.    Fordham is a charter school sponsor under Ohio law and the schools Fordham sponsors are eligible award recipients under the CSP.

119.    One or more of the schools Fordham has sponsored will likely apply for CSP funds in future award periods.

120.    The schools Fordham sponsors generally serve larger percentages of minority students than traditional public schools in the same districts.

121.    For instance, as of April 2021, Dayton Public Schools reported major demographics comprised of 64.4% black, 23.55% white, and 6.49% Hispanic or Latino students.

122.    Fordham's sponsored schools in Dayton, however, serve larger numbers of black students than the school district at large.

123.    For example, the Dayton Early College Academy has major demographics of approximately 87% black, 5% white, and 4% Hispanic or Latino students.

124.    DECA Prep, also in Dayton, has major demographics of approximately 95% black, 1.3% white, and 1.2% Hispanic or Latino students.

125.    Similarly, for the 2020-21 school year, Cincinnati Public Schools reported that approximately 62% of its students were black, 21% were white, and 9% were Hispanic or Latino.

126.    Fordham's sponsored schools in Cincinnati, however, serve larger numbers of black students than the school district at large.

127.    In 2020-21, for example, of the students at Phoenix Community Learning Center in Cincinnati, 99% were black.

128.    Likewise, in 2020-21, 91% of students at Regeneration Schools in Cincinnati were black.

129.    The public school districts in Ohio served by Fordham's sponsored schools have ample space for additional students, and rather than providing overflow capacity, the public charter schools provide an alternative to under-enrolled public schools.

130.    The new rule will disadvantage some or all of the charter schools sponsored by Fordham in competition for CSP funding because the source districts are not over-enrolled, charter programs serve large concentrations of minority students, and traditional public schools in those communities have not shown a willingness to cooperate with charter school programs.

131.    The new rule will particularly disadvantage Fordham's schools that operate in urban areas, such as Dayton or Cincinnati, as they will be unlikely to meet the new rule's priorities related to community collaboration, as many local school districts have demonstrated hostility to charter school expansion and will be unlikely to assist new or existing charter schools.

132.    The new rule will also disadvantage Fordham's schools concerning the grading of the "quality of the needs analysis" requirement as the members will not be able to demonstrate a "sufficient demand" for the charter schools based on enrollment numbers in existing public schools. Many of the traditional school districts in Ohio have ample space for new students.

133.    Fordham's schools will likely be unable to demonstrate that their proposed programs will serve a "racially … diverse student body" as defined by the new rule, because they will be located in communities that are predominantly comprised of minority students, and thus the new rule defines the community as being "racially segregated or isolated."

134.    These Fordham schools will also be disadvantaged by the new rule because their student demographics will likely serve larger percentages of students who are racial minorities than the community at large, and thus will be viewed as increasing the racial segregation or isolation of the students in the proposed charter school projects.

### COUNT I—VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(C)—RULE IN EXCESS OF STATUTORY AUTHORITY

135.    Plaintiffs repeat and reallege each and every allegation hereinabove as if fully set forth herein.

136.    "It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). Thus, "an agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). The

24

Administrative Procedure Act (APA) directs a court to "hold unlawful and set aside" an agency's rule that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right" or "in excess of statutory jurisdiction [or] authority." 5 U.S.C. § 706(2)(A), (B), (C).

137.    The final rule is "final agency action," which is reviewable under the APA. *See* 5 U.S.C. § 704.

138.    The final rule, issued after notice and comment rulemaking, marks the consummation of the Department's decision-making process concerning allocation of funds under the CSP.

139.    The final rule also determines rights and legal obligations, as it purports to establish criteria upon which allocation of CSP funds will be made.

140.    The Department has no delegation of regulatory authority to issue the rule.

141.    The Act includes no provision allowing the Secretary to designate additional criteria or priorities for awarding grants. *See* 20 U.S.C. §§ 7221b, 7221d. Instead, it lists exhaustive factors that the Secretary must consider in the relevant applications, and priorities for making awards.

142.    Without a delegation of rulemaking authority, the Secretary has "literally has no power to act." *See La. Pub. Serv. Comm'n*, 476 U.S. at 374.

143.    The final rule was issued in excess of statutory authority and is therefore invalid.

144.    As a result of the foregoing, Plaintiffs are entitled to a declaratory judgment and permanent injunction barring enforcement of the final rule, vacatur of the rule, attorneys' fees, expenses, costs and disbursements, and any other relief that may be appropriate.

### COUNT II—VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(A)—ARBITRARY AND CAPRICIOUS RULEMAKING

145.    Plaintiffs repeat and reallege each and every allegation hereinabove as if fully set forth herein.

146.     A court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency's action is arbitrary and capricious "if the agency has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

147.     The proposed rule is invalid because it attempts to negate the Act's core purpose—to "increase the number of high-quality charter schools available to students across the United States." *See* 20 U.S.C. § 7221(3).

148.     The "community-centered approach" and "collaboration" criteria set out in the priorities allow the Department to withhold funds when local school districts refuse to cooperate with charter school projects.

149.     By weighing the extent and characteristics of cooperation from traditional school districts from which the applicants will draw students, school districts will be able to veto innovative educational alternatives presented by charter schools, and thus reduce the availability of available charter schools.

150.     The requirement for a "needs analysis" ensures that charter schools that serve school districts with failing, albeit under-enrolled, schools will be unable to demonstrate a sufficient need to be considered for grant funding.

151.     The most successful charter schools are those that provide educational alternatives to under-enrolled schools, not those that simply house excess numbers of students.

152.    The requirement that the applicant demonstrate that it will neither increase segregation or isolation or hamper desegregation efforts in either the proposed charter school or the source school district creates an impossible standard that can be applied against any school.

153.    Applicants who serve large groups of minority or otherwise disadvantaged students without direct parity with district demographics can be seen as either resulting in racial isolation in the proposed charter school or in the source district.

154.    This requirement can be used to disadvantage any applicant, undermining the statutory purpose of expanding access to charter schools, particular for disadvantaged students.

155.    The rule is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law and is therefore invalid under 5 U.S.C. § 706(2)(A).

156.    As a result of the foregoing, Plaintiffs are entitled to a declaratory judgment and permanent injunction barring enforcement of the final rule, vacatur of the rule, attorneys' fees, expenses, costs and disbursements, and any other relief that may be appropriate.

**COUNT III—VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 553(c)—LACK OF MEANINGFUL OPPORTUNITY TO COMMENT**

157.    Plaintiffs repeat and reallege each and every allegation hereinabove as if fully set forth herein.

158.    The APA requires agencies to provide a meaningful opportunity for interested parties to comment on a proposed rule. *See* 5 U.S.C. § 553(c).

159.    The Department allowed only a 35-day comment period, during which "26,586 parties submitted comments," with "[a]pproximately 5,770 of the total comments received [being] unique comments." 87 Fed. Reg. at 40,407.

160.    Among the comments were substantive objections to the Department's lack of authority to issue the rule and challenges to the authority of an inferior officer to issue the rule.

161.    The Department failed to meaningfully respond to these comments or appropriately extend the comment period, in violation of the APA.

162.    As a result of the foregoing, Plaintiffs are entitled to a declaratory judgment and permanent injunction barring enforcement of the final rule, vacatur of the rule, attorneys' fees, expenses, costs and disbursements, and any other relief that may be appropriate.

## COUNT IV—VIOLATION OF U.S. CONSTITUTION, APPOINTMENTS CLAUSE, ART. II, § 2, CL. 2

163.    Plaintiffs repeat and reallege each and every allegation hereinabove as if fully set forth herein.

164.    "The President is responsible for the actions of the Executive Branch and cannot delegate that ultimate responsibility or the active obligation to supervise that goes with it." *United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1978−79 (2021) (citation omitted). And while "no single person could fulfill that responsibility alone" and "thousands of officers wield executive power on behalf of the President in the name of the United States. That power acquires its legitimacy and accountability to the public through a clear and effective chain of command down from the President, on whom all the people vote." *Id*. at 1979 (citation omitted).

165.    The Appointments Clause thus provides: "[The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . Officers of the United States . . . but Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." Art. II, § 2, cl. 2.

166.    An "officer" who "exercis[es] significant authority pursuant to the laws of the United States," must therefore be appointed, at least, by the "head of a department." *Arthrex*, 141 S. Ct. at 1980.

167.    Taking "final agency action constitutes significant authority pursuant to the laws of the United States," which must be performed by a properly appointed officer. *Ass'n of Am. Railroads v. U.S. Dep't of Transp.*, 821 F.3d 19, 37–38 (D.C. Cir. 2016) (citation omitted); *see also U.S. Dep't of Transp. v. Ass'n of Am. Railroads*, 575 U.S. 43, 64 (2015) (Alito, J., concurring) ("nothing final should appear in the Federal Register unless a Presidential appointee has at least signed off on it").

168.    The rule was not issued by an officer of the United States, and thus is invalid.

169.    As a final rule that sets out mandatory criteria for allocation of funding appropriated by Congress, whoever issued the rule was exercising significant authority on behalf of the Department. Only an "officer" of the United States could do so, and likely only a Presidentially appointed one at that. *See Arthrex*, 141 S. Ct. at 1980.

170.    The rule, however, was issued by Deputy Assistant Secretary Ryder, a career civil servant who was not appointed by the President or even the Secretary of Education.

171.    As the rule was issued without appropriate oversight from the President, it is invalid. *See Arthrex*, 141 S. Ct. at 1980.

172.    As a result of the foregoing, Plaintiffs are entitled to a declaratory judgment and permanent injunction barring enforcement of the final rule, vacatur of the rule, attorneys' fees, expenses, costs and disbursements, and any other relief that may be appropriate.

### PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons, Plaintiffs demand judgment against Defendants as follows:

(i) The issuance of an injunction prohibiting Defendants from enforcing the final rule pursuant to 5 U.S.C. § 705 and 28 U.S.C. § 2201;

(ii) A declaratory judgment, pursuant to 5 U.S.C. § 706(2) and 28 U.S.C. § 2202, holding unlawful and setting aside the final rule;

(iii) An award of attorneys' fees and costs to Plaintiffs; and

(iv) Any other relief as the Court deems just, equitable and proper.

## **JURY DEMAND**

Plaintiffs herein demand a trial by jury of all triable issues in the present matter.

DATED:  August 8, 2022.

Respectfully submitted,

*/s/ Frank Garrison*
**FRANK GARRISON**
**CALEB KRUCKENBERG**
Pacific Legal Foundation
3100 Clarendon Blvd, Suite 610
Arlington VA 22201
Telephone: 202-888-6881
FGarrison@pacificlegal.org
CKruckenberg@pacificlegal.org

**ANASTASIA BODEN**
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, California 95814
Telephone: (916) 419-7111
ABoden@pacificlegal.org

*Attorneys for Plaintiffs*